IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

JEANETTE R. DEWITT,

       Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

No. C08-0012

ORDER ON JUDICIAL REVIEW

_____

**TABLE OF CONTENTS**

*I.*    *INTRODUCTION.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*II.*   *PRIOR PROCEEDINGS.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*III.*  *PRINCIPLES OF REVIEW.* . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*IV.*  *FACTS.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    *A.*   *DeWitt's Education and Employment Background.* . . . . . . . . . . . . 4
    *B.*   *Administrative Hearing Testimony.* . . . . . . . . . . . . . . . . . . . 4
        *1.*   *DeWitt's Testimony.* . . . . . . . . . . . . . . . . . . . . . . . . 4
        *2.*   *Phyllis Phillips' Testimony.* . . . . . . . . . . . . . . . . . . . . 6
        *3.*   *Raymond DeWitt's Testimony.* . . . . . . . . . . . . . . . . . . 7
        *4.*   *Vocational Expert's Testimony.* . . . . . . . . . . . . . . . . . . 7
    *C.*   *DeWitt's Medical History.* . . . . . . . . . . . . . . . . . . . . . . . 8

*V.*   *CONCLUSIONS OF LAW.* . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    *A.*   *ALJ's Disability Determination.* . . . . . . . . . . . . . . . . . . . . 13
    *B.*   *Whether the ALJ Fully and Fairly Developed the Record.* . . . . . . . 15
        *1.*   *The Opinions of Dr. Snavely.* . . . . . . . . . . . . . . . . . . . 15
        *2.*   *Credibility Determination.* . . . . . . . . . . . . . . . . . . . . 17

*VI.*  *CONCLUSION.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*VII.* *ORDER.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 1) filed by Plaintiff Jeanette R. DeWitt on January 23, 2008, requesting judicial review of the Social Security Commissioner's decision to deny her application for Title II disability insurance benefits. DeWitt asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits. In the alternative, DeWitt requests the Court to remand this matter for further proceedings.

## II. PRIOR PROCEEDINGS

On August 11, 2004, DeWitt applied for disability insurance benefits. In her application, DeWitt alleged an inability to work since December 31, 1997 due to depression, fatigue, and inability to concentrate. DeWitt's application was denied on December 2, 2004. On March 2, 2005, her application was denied on reconsideration. On April 27, 2005, DeWitt requested an administrative hearing before an Administrative Law Judge ("ALJ"). On October 28, 2005, DeWitt appeared with counsel, via video conference, before ALJ Andrew T. Palestini. DeWitt, her husband, Raymond DeWitt, her sister, Phyllis Phillips, and vocational expert Vanessa May testified at the hearing. In a decision dated June 28, 2006, the ALJ denied DeWitt's claim. The ALJ determined that DeWitt was not disabled and not entitled to disability insurance benefits because she was functionally capable of performing her past relevant work as a laborer/landscaper, deli cutter-slicer, cleaner/housekeeper, and office helper. The ALJ also determined that DeWitt was capable of performing other work that exists in significant numbers in the national economy. DeWitt appealed the ALJ's decision. On November 30, 2007, the Appeals Council denied DeWitt's request for review. Consequently, the ALJ's June 28, 2006 decision was adopted as the Commissioner's final decision.

On January 23, 2008, DeWitt filed this action for judicial review. The Commissioner filed an answer on May 20, 2008. On July 15, 2008, DeWitt filed a brief

arguing there is not substantial evidence in the record to support the ALJ's finding that she is not disabled and that she could perform her past relevant work or other work that exists in significant numbers in the national economy. On August 14, 2008, the Commissioner filed a responsive brief arguing the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On February 27, 2008, both parties consented to proceed before the undersigned in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 405(g), the Court has the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court must consider "whether the ALJ's decision is supported by substantial evidence on the record as a whole." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citing *Harris v. Barnhart*, 356 F.3d 926, 928 (8th Cir. 2004)). Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. *Id.* (citing *Sultan v. Barnhart*, 368 F.3d 857, 862 (8th Cir. 2004)). Furthermore, "[s]ubstantial evidence is 'something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions does not prevent an administrative agency's findings from being supported by substantial evidence.'" *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (quoting *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989), in turn quoting *Consolo v. Fed. Mar. Comm'n*, 282 U.S. 607, 620 (1966)).

3

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester*, 416 F.3d at 889 (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Guilliams*, 393 F.3d at 801. "[E]ven if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Id.* (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)).

## IV. FACTS

### A. DeWitt's Education and Employment Background

DeWitt was born in 1948. She is a high school graduate. The record contains a detailed earnings report for DeWitt. Since her alleged disability onset date of December 31, 1997, DeWitt has had earnings of $1,043.57 in 1998, $3,299.51 in 1999, $4,329.75 in 2000, and $39.14 in 2001. According to the earnings report, she has no earnings since 2002.

### B. Administrative Hearing Testimony

### 1. DeWitt's Testimony

At the administrative hearing, DeWitt's attorney asked DeWitt to discuss her mental health problems. DeWitt explained that her psychological problems started around 1972. She testified that she is unable to "do a lot at one time because I get too tired and I have to lay down and sleep."[1] DeWitt also testified that she periodically suffers from paranoia. DeWitt further indicated that she sought treatment every six months in order to get her prescriptions filled. Specifically, DeWitt stated:

> A:    . . . I couldn't get any prescriptions filled unless I
> talked to [my doctor]. So, every six months I just went
> in for a short appointment, and the thing of it was he

---

[1] *See* Administrative Record at 321.

4

didn't talk to me. He just said oh, you're okay and let
me go.

(Administrative Record at 321-22.)

DeWitt's attorney also questioned DeWitt regarding her memory difficulties.
DeWitt and her attorney had the following colloquy:

> Q: Is your memory affected do you think?
> A: Yes. Very much so.
> Q: Can you describe that, how your memory is?
> A: Well, this morning I took a bag of medication in from the kitchen to the bedroom and I couldn't remember where I put it.
> Q: Okay, and has that been that way for a while or is that new?
> A: It's been that way for a while. . . .
> Q: Is your memory affected as far as things that happened in the past? Do you have trouble recalling, for example, high school days or things that happened in the past?
> A: Yeah.
> Q: When you were younger?
> A: Yeah, some. . . .
> Q: How [about] for recent events, do you have any trouble that way?
> A: Yeah, I think I still do.
> Q: Okay. Now you had this neural psych examination by Dr. Snavely, do you recall that?
> A: Yeah.
> Q: Do you remember the discussion afterwards with, with how she thought you were doing?
> A: Well, at first she thought maybe I had Alzheimer's, because I couldn't remember and then she went for the testing and she said no, it wasn't Alzheimer's.
> Q: But she, did she find definite deficits in your memory?
> A: Yes. . . .
> Q: Are you, are you able to remember from day-to-day what happened?
> A: Some things yes, some things no.

> Q: Has, was your memory ever [been] an issue in any job that you had other than what you already described to me?
>
> A: Oh yeah. I worked at Hy-Vee and we were supposed to learn the prices of the products and just, they gave me easier jobs because I couldn't function in the, in the deli part of it. So then I was doing dishes and stuff like that and finally I asked them, how come my hours are cut and I just do dishes, and they said because you couldn't handle the other.
>
> Q: So your, whoever you were working with realized that you were having difficulties with the details of the job?
>
> A: Yes.
>
> Q: So dishwashing was about as much as they'd let you do?
>
> A: Yeah.

(Administrative Record at 323-26.)

When asked whether she was able to take care of herself on a day-to-day basis, DeWitt replied that she was able to take care of her own needs. She stated "as far as staying clean and neat I think I do a good job."[2] DeWitt also testified that she was able to perform household duties, such as cooking and cleaning.

### 2. Phyllis Phillips' Testimony

Phyllis Phillips ("Phillips") is DeWitt's sister. At the hearing, Phillips testified that DeWitt has a bad memory. DeWitt's attorney asked Phillips to provide an example of DeWitt's memory difficulties:

> A: Well, like, you know she, I did daycare in my home and she would work for me off and on at different times. And, like if I told her three things to do, by the time she got one done she forgot the other two. And just small things, you know. I had, you just had to tell her everything to do and then she does it[.] . . .

---

[2] See Administrative Record at 328.

(Administrative Record at 335.) Phillips also testified that DeWitt has difficulties with fatigue during the daytime because she does not sleep well at night.

### 3.   *Raymond DeWitt's Testimony*

Raymond DeWitt ("Raymond") is DeWitt's husband. They have been married for seven years. At the hearing, Raymond testified that DeWitt has difficulty keeping a job because she has a bad memory and can't handle the stress of working. Regarding her memory, Raymond testified:

> A:    [DeWitt] can't remember locations. Several times she's had babysitting jobs and I would have to take her for two or three days and the next time she went she would get lost. She's even, my grandson was living with us and he was going to school and she wouldn't know how to get back home. She could always find home, but she'd go a couple of miles out of her way sometimes. She just gets turned around.

(Administrative Record at 346.)

### 4.   *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Vanessa May with a hypothetical for an individual with the following limitations:

> [The individual is] able to do only simple, routine repetitive tasks, only with occasional changes in routine work setting, but no changes in vocation. Could occasional [sic] make simple independent decisions. Could not work with strict quotas or time-frames. . . .   [O]ccasionally would need supervision, possibly reminder of tasks. Would have occasion or [sic] contact and interaction with the public of a superficial nature. Also interaction with coworkers would be superficial and there should be no need to remember or relate detailed information or to remember detailed information to perform [his or] her job duties.

(Administrative Record at 348.) The vocational expert testified that under such limitations, DeWitt could perform her past relevant work as a landscape laborer, deli cutter/slicer, housekeeper, or office helper. The vocational expert further testified that DeWitt could

also perform unskilled work as a photocopy machine operator (800 positions in Iowa and 97,000 positions in the nation), flower picker (6,600 positions in Iowa and 860,000 positions in the nation), and document preparer (34,000 positions in Iowa and 2,900,000 positions in the nation). When asked whether DeWitt would be employable if she had difficulty completing tasks or getting to the work site because of episodes of paranoia and forgetfulness, the vocational expert testified that DeWitt would be unable to find competitive employment.

### C. DeWitt's Medical History

The record contains treatment notes from Dr. R. Paul Penningroth, M.D., dating from January 31, 1996 to September 14, 2004. In 1996, Dr. Penningroth found that DeWitt was "doing fine." On March 4, 1997, Dr. Penningroth noted that DeWitt was having relationship difficulty and not taking her medicine. Dr. Penningroth placed her back on Stelazine and Cogentin as treatment. On July 27, 1998, Dr. Penningroth indicated that DeWitt was "doing well" and had stayed on her medication. On March 30, 1999, Dr. Penningroth found that DeWitt was "doing fine." Dr. Penningroth also noted that she was not paranoid or depressed. On December 8, 1999, Dr. Penningroth found that DeWitt was "doing fine." Dr. Penningroth noted that her mood, appetite, and sleep were good. On June 28, 2000, Dr. Penningroth determined that DeWitt was "doing well." Dr. Penningroth noted that she was "not paranoid or hearing voices with the medication."[3] On February 27, 2001, Dr. Penningroth opined that DeWitt "is doing well while she takes her medication."[4]

On May 21, 2001, Dr. Penningroth found that DeWitt was not doing very well. Specifically, Dr. Penningroth's notes provide:

> [DeWitt] is concerned. She believes that her husband is working with her ex-husband John to have her killed because

---

[3] *See* Administrative Record at 192.

[4] *Id.* at 191.

> she knows too much. She knows about a murder John
> committed while they were married and about a murder he
> committed many, many years ago. She feels that she has to
> call the police and report these murders and her life is in
> danger.

(Administrative Record at 190.) Dr. Penningroth's notes provide no diagnoses or impressions as to DeWitt's mental state. Dr. Penningroth simply increased her dosages of Stelazine and Cogentin as treatment. On June 4, 2001, Dr. Penningroth found that DeWitt was "doing better." She did not fear that her husband was going to kill her anymore. On June 28, 2001, Dr. Penningroth found that DeWitt was "doing okay."

On December 3, 2001, Dr. Penningroth determined that DeWitt was "doing fine." Specifically, Dr. Penningroth noted that:

> A couple of months ago [DeWitt] went through an episode of
> paranoia when she thought her ex-husband was going to kill
> her again but she stayed fast and continued her medication and
> worked through it.

(Administrative Record at 187.) On June 4, 2002, Dr. Penningroth found that DeWitt was "doing fine." Dr. Penningroth noted that her appetite, mood, and sleep were good. Dr. Penningroth also noted that he paranoia seemed to be under control. DeWitt was also "doing fine" on January 7, 2003, July 29, 2003, and December 10, 2003. On July 26, 2004, Dr. Penningroth noted that DeWitt was discouraged because she was having difficulty keeping a job. Dr. Penningroth continued her medications as treatment. On September 14, 2004, Dr. Penningroth found that DeWitt was "doing fine," but noted that she had been depressed for a couple of weeks prior to her visit. Dr. Penningroth continued her medications as treatment.

On December 1, 2004, Dr. Rhonda Lovell, Ph.D., reviewed DeWitt's medical records and provided Disability Determination Services ("DDS") with a Psychiatric Review Technique assessment and a mental residual functional capacity ("RFC") assessment for DeWitt. On the Psychiatric Review Technique assessment, Dr. Lovell diagnosed DeWitt with psychotic features evidenced by delusions or hallucinations.

9

Dr. Lovell determined that DeWitt had the following limitations: mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Lovell determined that DeWitt was moderately limited in her ability to: perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Lovell concluded that:

> [DeWitt's] allegations are partially supported by the medical record. . . . [DeWitt] appears to be generally stable on medications and is typically seen every six months. She did experience some paranoia in 5/01 but was able to return to baseline within a month or two. . . . [Activities of daily living] include cleaning house, preparing meals, doing laundry, and shopping. [DeWitt] drives, manages money, attends church, goes for walks and goes out to eat and to sporting events.
> [DeWitt] appears to have a severe mental impairment that does not meet or equal a referenced listing. Based on treatment notes and [activities of daily living], [DeWitt] is able to understand and remember instructions and procedures for basic and detailed tasks. Concentration is sufficient to carry out tasks[.] . . . [DeWitt's activities of daily living] also support adequate social skills. Based on treatment history, [DeWitt's] psychotic disorder interferes with her ability to regularly complete a typical work week to no more than a moderate degree. . . .

(Administrative Record at 210.)

On May 10 and 19, 2005, DeWitt underwent a neuropsychological evaluation conducted by Dr. Ellie Snavely, Ph.D., a licensed psychologist. Dr. Penningroth referred DeWitt to Dr. Snavely for assessment of her cognitive status to rule out memory disorder versus reduced concentration. DeWitt informed Dr. Snavely that she was concerned

"about the fact that she has not been able to concentrate or remember things."[5]
Dr. Snavely noted that most of her memory difficulties were in the work setting.
Dr. Snavely described DeWitt's mental health history as follows:

> Past and current status are significant for manic depressive
> disorder currently under treatment. [DeWitt] states that she
> was called schizophrenic at one point because she had a
> tendency to get paranoid. She has been hospitalized on many
> occasions. She estimates that her first psychiatric treatment
> was 34 years ago. She has been continuously treated,
> including with medication, since that time.

(Administrative Record at 226.)

DeWitt and Dr. Snavely also discussed her activities of daily living. DeWitt
informed Dr. Snavely that she believed her performance of household chores had declined
in comparison to the past. Specifically, Dr. Snavely noted that:

> [DeWitt] is cooking less and they are going out to eat more.
> [DeWitt and her husband] do laundry together. She believes
> that she is doing fewer of these things because of boredom and
> lack of interest and motivation rather than lack of ability.

(Administrative Record at 226.) Dr. Snavely also noted that DeWitt maintains her hygiene
independently. Dr. Snavely further noted that she regularly sleeps 3-4 hours during the
day.

Dr. Snavely administered several tests to DeWitt, including the Wechsler Adult
Intelligence Scale - III, Wechsler Individual Achievement Test - II, Rey Auditory Verbal
Learning Test, and Wechsler Memory Scale - III. Dr. Snavely found that DeWitt's overall
assessment results suggested "diffuse acquired cognitive deficits for short term memory
and many areas of abstract conceptualization in an erratic pattern of performances."[6]
Dr. Snavely opined that DeWitt's cognitive status "clearly demonstrates that [DeWitt] has

---

[5] *See* Administrative Record at 225.

[6] *See* Administrative Record at 228.

a variety of significant cognitive impairments secondary to her psychiatric illness that reduce her ability to function."[7] Dr. Snavely also found that DeWitt suffered from moderate depression which in part accounted for her "observed cognitive deficits." Dr. Snavely offered no suggestions for treatment.

On September 27, 2005, DeWitt was admitted through the emergency room to St. Luke's Hospital in Cedar Rapids, Iowa. At the hospital, Dr. Penningroth examined DeWitt and determined that she was delusional without hallucinations. Dr. Penningroth diagnosed her with manic depressive disorder and mania with psychosis. DeWitt was treated at the hospital and later discharged during the first part of October.

On October, 16, 2005, DeWitt was admitted to the University of Iowa Hospitals and Clinics ("UIHC") for depression and psychosis. DeWitt had delusions that her husband wanted to destroy her and that she killed her son. She was discharged on October 26, 2005. DeWitt's discharge record noted that "her mood improved and she brightened considerably, [but] her delusions have remained intact and we recommended psychotherapy in a partial hospitalization program [would] benefit her the most."[8] On December 1, 2005, DeWitt was admitted to the UIHC for psychosis. Again, she was delusional and felt unsafe around her husband. During her hospital course, her delusions subsided and when she was discharged on December 16, 2005, she was stable. DeWitt had a third hospital stay at the UIHC from February 1, 2006 to February 9, 2006. Similar to her other hospitalizations, DeWitt was delusional and believed that her husband was trying to poison her. Her delusions had stabilized when she was discharged. DeWitt was re-hospitalized on February 24, 2006, for delusional behavior. She was not delusional when she was discharged on March 19, 2006. DeWitt was hospitalized for delusions for a fifth time on March 23, 2006. She was discharged on April 19, 2006. Her discharge

---

[7] *Id.*

[8] *Id.* at 259.

12

report noted that she had "[s]ignificantly improved insight that her 'dark thoughts' are symptoms of her mental illness rather than truths about her family. . . . Her mood is much brighter and her affect is full."[9] DeWitt was hospitalized again for delusions on May 26, 2006. She was discharged on June 16, 2006, and reported that she felt "good" and was "ready to go home."

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that DeWitt is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 404.1520(a)-(f); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007); *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004)); *see also* 20 C.F.R. § 404.1520(a)-(f). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Eichelberger*, 390 F.3d at 590-91 (citing *Ramirez v. Barnhart*, 292 F.3d 576, 580 (8th Cir. 2002)).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he [or she] is unable to perform his [or her] past relevant work." *Frankl v. Shalala*, 47 F.3d 935, 937 (8th Cir. 1995) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the

---

[9] *See* Administrative Record at 285.

Commissioner to demonstrate that the claimant retains the residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Id.* The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. "'It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his [or her] limitations.'" *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001)).

The ALJ applied the first step of the analysis and determined that DeWitt had not engaged in substantial gainful activity since her alleged disability onset date, December 31, 1997. At the second step, the ALJ concluded, from the medical evidence, that DeWitt had the following severe impairment: bipolar disorder with paranoia. At the third step, the ALJ found that DeWitt's "mental impairment does not manifest itself to the degree of severity that would meet the criteria described in the Listing of Impairments (20 C.F.R. [§] 404, Appendix 1, Subpart P, [Regulations No. 4])." At the fourth step, the ALJ determined DeWitt's RFC as follows:

> [DeWitt] has no exertional limitations. She is able to do only simple, routine repetitive tasks. She could have occasional changes in a routine work settings [sic] but not location, occasionally make simple independent decisions, would occasionally require supervision such as being reminded of tasks, have occasional contact/interaction with the public of a superficial nature and have superficial interaction with co-workers. She cannot perform tasks requiring strict quotas or timeframes and cannot be required to remember/relate details or data to perform job duties.

(Administrative Record at 22.) Using this RFC, the ALJ determined that based on her age, education, previous work experience, and RFC, DeWitt was capable of performing her past relevant work and also had the ability to work at jobs that exist in significant

numbers in the national economy. Therefore, the ALJ concluded that DeWitt was "not disabled."

## B. Whether the ALJ Fully and Fairly Developed the Record

DeWitt contends that the ALJ erred in two respects. First, DeWitt argues that the ALJ failed to give good reasons for rejecting the opinions of Dr. Snavely. Second, DeWitt argues that the ALJ failed to properly consider her subjective allegations of disability.

### 1. The Opinions of Dr. Snavely

An ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). The opinion of a treating physician:

> should not ordinarily be disregarded and is entitled to
> substantial weight. A treating physician's opinion regarding
> an applicant's impairment will be granted controlling weight,
> provided the opinion is well-supported by medically acceptable
> clinical and laboratory diagnostic techniques and is not
> inconsistent with the other substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted). The regulations provide that the longer the treating relationship between a physician and a patient, the more weight should be given to that treating physician's medical opinions. *See* 20 C.F.R. § 404.1527(d)(2)(I). Furthermore, an ALJ is "encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." *Singh*, 222 F.3d at 452. The regulations require an ALJ to give "good reasons" for giving weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). The regulations also require an ALJ to give "good reasons" for rejecting statements provided by a treating physician. *Id.* "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013

(8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003) (If the doctor's opinion is "inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight."); *Strongson*, 361 F.3d at 1070 (an ALJ does not need to give controlling weight to a physician's RFC assessment if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ).

In his decision, the ALJ discussed DeWitt's neuropsychological evaluation, including the findings and opinions of Dr. Snavely.[10] In considering Dr. Snavely's findings, the ALJ noted that the "report from Dr. Snavely is after the date last insured and appears to indicate that she was functioning at a lower level than anytime before in the record. The resulting IQ levels are not consistent with [DeWitt's] work history and could be attributed to her affect at the time of the test."[11]

DeWitt argues that Dr. Snavely's findings were retroactive to her date last insured, March 31, 2005, because she "clearly had memory problems prior to the evaluation as [she] had a history of memory problems that led to the evaluation."[12] The Commissioner summarily responds:

> Dr. Snavely was a one-time examining source who saw [DeWitt] after her insured status expired. Although Dr. Snavely interpreted test results to show that [DeWitt's] mental condition at the time of the examination indicated

---

[10] *See* Administrative Record at 20.

[11] *Id.* at 21.

[12] DeWitt's Brief at 13-14. Both parties agree that in order for DeWitt to be eligible for disability insurance benefits, the ALJ must find that she was disabled on or before her date last insured, March 31, 2005.

> cognitive impairments reducing her ability to function, she
> indicated that the severity of [her] depression was moderate.
> . . . Dr. Snavely did not provide a retroactive assessment of
> [DeWitt's] condition during the relevant period. Although
> [DeWitt's] treating physician, Dr. Penningroth, declined to
> provide a disability assessment, his contemporary records
> establish that [DeWitt's] mental impairment was controlled and
> stable on medication during the relevant period except for a
> very short episode in 2001. The ALJ provided legitimate
> reasons for not finding [DeWitt] disabled based on
> Dr. Snavely's one-time report and his decision should be
> upheld.

(Commissioner's Brief at 14.) Having reviewed the entire record, the Court finds that the ALJ properly considered and weighed the opinion evidence provided by Dr. Snavely and correctly pointed out that the "report from Dr. Snavely is after the date last insured and appears to indicate that she was functioning at a lower level than anytime before in the record."[13] *See Pyland v. Apfel*, 149 F.3d 873, 876 (8th Cir. 1998) ("In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status. *See* 42 U.S.C. §§ 416(I), 423(c); *Stephens v. Shalala*, 46 F.3d 37, 39 (8th Cir. 1995) (per curiam) (citing *Battles v. Sullivan*, 902 F.2d 657, 659 (8th Cir. 1990)."). The Court also finds that the ALJ provided "good reasons" for rejecting Dr. Snavely's opinions. *See* 20 C.F.R. § 404.1527(d)(2); *Strongson*, 361 F.3d at 1070; *Edwards*, 314 F.3d at 967. Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 2. *Credibility Determination*

DeWitt argues that the ALJ failed to properly evaluate her subjective allegations of disability. Specifically, DeWitt asserts that the ALJ failed to consider her subjective allegations in light of her structured life, various unsuccessful work attempts, long history

---

[13] *See* Administrative Record at 21.

of psychiatric treatment, and limited daily activities. The Commissioner argues that the ALJ properly considered DeWitt's testimony and properly evaluated the credibility of her subjective allegations.

When evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard them "solely because the objective medical evidence does not fully support them." *Polaski*, 739 F.2d at 1322. However, the absence of objective medical evidence to support a claimant's subjective complaints is a relevant factor for an ALJ to consider. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (citation omitted). "The [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski*, 739 F.2d at 1322. Subjective complaints may be discounted if inconsistencies exist in the evidence as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006) (citing *Polaski*, 739 F.2d at 1322). However, the ALJ must give reasons for discrediting the claimant. *Id.* (citing *Strongson*, 361 F.3d at 1072). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see also Guilliams*, 393 F.3d at 801 (explaining that deference to an ALJ's credibility determination is warranted if the determination is supported by good reasons and substantial evidence); *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) ("If the ALJ discredits a claimant's credibility and gives a good reason for doing so, we will defer to its judgment even if every factor is not discussed in depth."). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'"

*Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007) (quoting *Pearsall*, 274 F.3d at 1218).

In his decision, the ALJ properly set forth the law for making a credibility determination under *Polaski* and the Social Security Regulations. In applying the law, the ALJ found that:

> As for factors that weight [sic] against [DeWitt's] credibility, the undersigned notes that [DeWitt's] mental impairment was controlled except for an incident in May 2001 and then was easily controlled thereafter. She did not have another episode of paranoia until September 2005 which is well after the date last insured. . . . [DeWitt's] mental symptoms were well controlled when she was taking her medication and she was able to work part time at several jobs during the period of time in question. The signs and findings in the objective medical evidence are not commensurate with her allegations regarding the severity or intensity of her mental symptoms. [DeWitt] has a sporadic history of treatment. . . .

> While [DeWitt's] work activity after the alleged onset date did not arise to the level that would be considered substantial gainful activity under the regulations, it is indicative of an ability to work and inconsistent with her allegation that she was disabled since the alleged onset date.

> There was testimony from a third parties [sic] relating to the duration, frequency and intensity of [DeWitt's] subjective complaints. The undersigned finds that testimony of [DeWitt's] witnesses is basically cumulative and does not establish complete disability. Regarding the type, dosage, effectiveness and adverse side effects of medication, there was no indication in the evidence of record that [DeWitt's] medications were not efficacious when taken as prescribed or caused any disabling adverse side effects. . . .

> [DeWitt] testified that her activities of daily living consisted of socializing with a few friends, walking in the morning, going out for coffee, taking care of her personal needs, cooking and cleaning. In a January 24, 2005 function report [DeWitt]

> stated that she walks half a mile, goes out to eat regularly,
> goes to a fitness center, talks on the telephone, goes shopping
> and out with friends and does some housework and chores.
> [DeWitt's] allegation of limitations on her activities of daily
> living is inconsistent with her testimony and statements in the
> objective record. . . .
>
> For the foregoing reasons, the undersigned is persuaded
> [DeWitt's] allegations and that of her witnesses are not fully
> credible.

(Administrative Record 21-22.) It is clear from the ALJ's decision that he considered and addressed the *Polaski* factors in determining that DeWitt's subjective allegations of disability and the testimony of her witnesses were not fully credible. *See Johnson*, 240 F.3d at 1148; *see also Goff*, 421 F.3d at 791 (an ALJ is not required to explicitly discuss each *Polaski* factor, it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered. *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)."). The Court also finds that the ALJ provided good reasons for discrediting DeWitt's subjective allegations. *See Pelkey*, 433 F.3d at 578. Accordingly, because the ALJ seriously considered, but for good reasons explicitly discredited DeWitt's subjective complaints, the Court will not disturb the ALJ's credibility determination. *See Johnson*, 240 F.3d at 1148.

## VI. CONCLUSION

The Court finds that the ALJ properly considered and weighed the opinion evidence provided by Dr. Snavely. The ALJ also made a proper credibility finding with regard to DeWitt's subjective allegations of disability. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

1.   The final decision of the Commissioner of Social Security is **AFFIRMED**;

2.   Plaintiff's Complaint (docket number 1) is **DISMISSED** with prejudice; and

3.   The Clerk of Court is directed to enter judgment accordingly.

DATED this 21st day of November, 2008.

JON STUART SCOLES
United States Magistrate Judge
NORTHERN DISTRICT OF IOWA